463 So.2d 914 (1985)
Cleo B. BLAKENEY, Plaintiff-Appellant,
v.
TIDEWATER COMPRESSION SERVICE, INC., Defendant-Appellee.
HOME INDEMNITY COMPANY, Plaintiff-Appellant,
v.
HAFCO, INC., Defendant-Appellee.
No. 16759-CA.
Court of Appeal of Louisiana, Second Circuit.
January 23, 1985.
Rehearing Denied February 22, 1985.
Writ Denied April 19, 1985.
*915 Dimos, Brown, Erskine, Burkett & Smith by Donald R. Brown, Monroe, for Cleo B. Blakeney.
*916 Laborde & Lafargue by Cliffe E. Laborde and Elizabeth O'Brien, Lafayette, for Tidewater Compression Service, Inc.
McLeod, Swearingen, Verlander & Dollar by Elmer G. Noah, II, Monroe, for Hafco, Inc.
Hayes, Harkey, Smith & Cascio by Charles S. Smith, Monroe, for Home Indem. Co.
Before JASPER E. JONES, FRED W. JONES, Jr. and NORRIS, JJ.
JASPER E. JONES, Judge.
In this tort action the plaintiffs, Cleo B. Blakeney and Home Indemnity Company appeal a judgment rendered pursuant to a jury verdict, rejecting their demands for damages against Tidewater Compression Service, Inc. and Hafco, Inc.
We amend and render judgment against Tidewater and as amended affirm.
Blakeney was injured on September 13, 1979, while working on a compressor station as an employee of Helm Constructors, Inc. Helm had contracted to build the station for Tidewater. Home was Helm's worker's compensation insurer and paid Blakeney compensation benefits totaling $25,547.23 which it is seeking to recover under the subrogation provision of the worker's compensation law.
The station was located in a flood plain and for this reason was constructed upon a platform approximately ten feet high.
Helm rented a crane supplied with an operator from Hafco, Inc. to place the heavy compressor equipment upon the platform.
Blakeney sustained a serious knee injury while suspended in the air on a cable which was part of a sling that had been used to lift a cooling tower to the platform. The sling was attached to a cable and a boom on the Hafco crane and was controlled by Hafco's crane operator who was being directed by Doug Youngblood, an employee of Tidewater. Plaintiffs contend Blakeney's knee injury was caused by the negligence of Hafco's crane operator and Tidewater's employee, Doug Youngblood, who is referred to in the record as an inspector or supervisor.
The case was submitted to the jury on four interrogatories.[1] The jury, based upon the interrogatories, found that neither Tidewater nor Hafco were guilty of any negligence that caused Blakeney's knee injury and Blakeney was guilty of contributory negligence and assumption of the risk which caused his injuries. The jury for these reasons found plaintiffs were entitled to no award against the defendants.
The issues on appeal are whether these factual determinations by the jury are supported by substantial evidence and the judgment should be affirmed or whether all or part of the jury determinations are not supported by substantial evidence and plaintiffs are entitled to a judgment against either or both of these defendants.

BACKGROUND FACTS
In May of 1979 Tidewater contracted with United Gas Pipeline Company to construct the compressor station and lease it to United. In June, 1979 Helm contracted with Tidewater to construct the compressor station. Helm employed Blakeney as a carpenter and general construction worker to work on the construction of the compressor *917 station. The platform on which the compressor station was located had been completed and much of the equipment had been installed upon it prior to Blakeney's accident. On this date the Hafco crane was located very close to the platform upon which it had earlier placed two eighty-ton compressor units. These units were raised from the ground by a large cable sling consisting of four long cables (each 25 or 30 feet in length with a heavy shackle on the end) one of which was attached to each corner of the compressor. On the date of plaintiff's injury a cooling tower (much smaller and lighter than the compressors) was placed upon the platform by using the sling. Three of the sling cables were attached by the shackles to eyes located on top of the tower. The fourth cable of the sling was not used to lift the tower. After the tower was bolted to the floor of the platform it was necessary for a man to go to the top of the tower and remove the shackles from each of the eyes on top of the cooling tower in order that the sling could be removed from the tower. Doug Youngblood, who was supervising the tower installation, instructed four of Helm's employees, one of whom was Blakeney, that one of them was required to get upon the end of the remaining fourth cable of the sling (the other three were attached to the top of the tower) and be lifted to the top of the tower and remove the shackles from the top of the tower. Blakeney agreed to do this task.
He in some manner not entirely clear from the record secured his foot on the end of the cable and held onto it with his hands and was lifted to the top of the cooling tower (which was estimated by one of the witnesses to be about 30 feet tall). Blakeney proceeded to remove the shackles from two of the eyes at the top of the tower and almost had the last one unscrewed prepatory to removing it from the eye when the sling which included the cable upon which Blakeney was riding suddenly moved toward the outer edge of the platform away from the tower to which one of the cables of the sling remained attached. This movement was caused by the crane operator who was signaled by Doug Youngblood to bring the sling and Blakeney to the ground as the job was complete. This movement of the sling while still attached to the tower could have torn the tower from its anchored position on the platform to which it had been bolted by Blakeney and the other Helm employees. One or more of these employees shouted to Youngblood who was controlling the operation of the crane by signals to its operator, calling Youngblood's attention to the impending disengagement of the tower from the platform and Youngblood immediately signaled the crane operator to return the sling to the position above the tower and upon receiving this signal the crane operator immediately moved the boom and returned the sling to the position above the tower. When the movement of the sling away from the platform was suddenly reversed back toward the tower which was located on the opposite side of the platform from the crane, this change in direction and the momentum in connection with it caused the two cables of the sling which had been earlier removed from the tower and the one upon which Blakeney was riding to actively swing toward the tower with no control which could be exercised by anyone as to their direction with relation to each other. Blakeney described his position as being located in the middle of so much swinging "scrap iron." As the sling moved in this fashion to its required position above the tower one of the large shackles attached to the end of one of the swinging cables of the sling struck Blakeney on the knee causing the serious permanent injury which precipitated this litigation. After Blakeney was returned to the position above the tower he removed the remaining shackle from its position in the eye at the top of the tower. The sling was lowered to the top of the platform or the ground and Blakeney got off of the end of the cable which he had ridden to perform the task of disconnecting the sling from the tower. He realized his knee was hurt but did not realize the severity of his injury and continued to work for about a month.

*918 NEGLIGENCE OF HAFCO, INC.
The position of the crane within about two feet of the platform directly in front of the area of the platform where the large compressors and other machinery had earlier been installed resulted in the crane operator being unable to see the area on the platform where the tall cooling tower was installed. Because of the obstruction of the crane operator's view by the platform and equipment upon it the manner in which he operated the boom and cable to which the sling was attached depended totally upon signals received by the operator from Doug Youngblood who had positioned himself on the ground (or perhaps on the platform) at a point where he could observe the area on the platform where the tower was installed and also see and be seen by the crane operator. All of the movements of the sling by the crane operator were made in response to signals from Youngblood. The total inability of the crane operator to see the tower operation and the necessity of his reliance upon Youngblood was established by all the evidence at trial. There is no evidence that the crane operator failed to respond properly to the signals given by Youngblood nor that he moved the sling without receiving a signal from Youngblood.
Hafco secured the crane operator's presence at trial but never called him to testify.
Appellants contend Hafco's failure to place this witness on the stand creates a presumption that his testimony would be unfavorable to Hafco. Upon the basis of this presumption appellants argue Hafco should be found negligent and the jury's determination of no negligence on the part of Hafco should be reversed. We find this contention without merit because the presumption only arises when the party against whom it is sought to be applied has the burden of proof and control over or a close relationship to the witness. Wolfe v. Employers Commercial Union Insurance Co., 272 So.2d 714 (La.App. 3d Cir.1973). The appellants had the burden of proving the negligence of the crane operator and is not entitled to the presumption.
None of appellants witnesses testified to any fact to support a finding of negligence on the part of the crane operator nor is there any other evidence in the record which would support a finding that Hafco was guilty of negligence. We find the jury's determination that Hafco was guilty of no negligence is correct.

NEGLIGENCE OF TIDEWATER
Doug Youngblood was employed by Tidewater and was characterized by Helm's employees as an inspector or supervisor. Youngblood died before the case was tried and his testimony was not produced by earlier deposition. Helm's job superintendent was Pete Stockley and Helm's foreman was Red Mathews. However, Youngblood often gave Helm's employees orders directing the manner in which they performed their work.
Youngblood issued the order to four Helm employees which included Blakeney that one of them ride the unattached fourth cable of the sling to the top of the cooling tower and disconnect the three cables of the sling from the tower. Blakeney responded to this order and volunteered to be the Helm employee that would do the task. The use of the fourth cable of the sling for the purpose of placing Blakeney at the top of the tower resulted in Blakeney remaining in the immediate proximity of each of the remaining cables as the shackles at the end of each of them were detached from the tower. Any movement of the sling following the detachment of any of the cables from the tower which would cause the freed cables to swing subjected Blakeney, who was riding the fourth cable, to the danger of being struck by the other free swinging cables or the shackles at the end of each of them. The method used to remove the attached cables from the tower required that the sling be maneuvered in such a manner as to minimize the swinging of the cables in order to avoid striking Blakeney with one of them. The movement of the sling by the crane operator away from the tower and toward the edge *919 of the platform at a time when one cable of the sling was still attached to the tower and then immediately moving the sling back over the tower caused the two freed cables of the sling to swing freely in the air and the shackle upon one of them to strike Blakeney's knee. If all of the cables had been removed from the tower and the sling slowly lowered directly to the platform in the immediate proximity of the tower this would have required little or no horizontal movement of the cables of the sling and no danger to Blakeney who could have stepped from the cable onto the platform. No accident would have occurred.
Youngblood positioned himself to observe the tower installing operation and serve as signalman to the crane operator. There is no evidence in the record to establish that he could not observe Blakeney at the top of the tower and each of the cables attached to the tower. He should not have signaled the crane operator to move the sling away from the tower while one of the cables remained attached to it and having made this mistake, he should not have immediately reversed the movement of the sling back toward the tower. These movements of the sling caused the free swinging shackle to strike Blakeney's knee.
Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It is a departure from the conduct expected of a reasonable prudent man under like circumstances. Pence v. Ketchum, 326 So.2d 831 (La.1976); Craft v. Caldwell Parish Police Jury, 455 So.2d 1226 (La.App. 2d Cir.1984).
Whether a legal duty is owed by one party to another depends on the facts and the circumstances of the case and the relationship of the parties. The legal duty is the obligation to conform to the standard of conduct of a reasonable man under like circumstances. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La. 1977); Craft v. Caldwell Parish Police Jury, supra.
Youngblood issued the order that placed Blakeney on the end of a cable of the sling and he controlled the movement of the sling. He was intimately familiar with the entire operation. The relationship between Youngblood and Blakeney and all of the circumstances placed upon Youngblood a duty to conduct his function of relaying signals to the crane operator in such a way as not to create an unreasonable risk of harm to Blakeney. Youngblood violated his duty to Blakeney when he signaled the crane operator to move the sling away from the tower without ascertaining that all the cables had been removed from the tower and were clear of it. Youngblood again conducted himself in an unreasonable manner under the circumstances when he suddenly reversed the movement of the sling back towards the tower, at which time one of the shackles on the end of the swinging cable struck Blakeney's knee. Blakeney was injured due to the negligence of Youngblood.
An employer is liable for a tort committed by his employee who is acting in the scope of his employment in the exercise of duties for which he is employed. LSA-C.C. 2320; Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968); LeBrane v. Lewis, 292 So.2d 216 (La.1974); Craft v. Caldwell Parish Police Jury, supra.
A contractor's employee, who is injured by the negligence of an employee of the contractor's principal related to the work being performed by the contractor's employee, has a tort cause of action against the contractor's principal where the principal has not established immunity under the worker's compensation statute.[2]Lewis v. Exxon Corp., 441 So.2d 192 (La. 1983); Lewis v. Exxon Corp., 451 So.2d 24 (La.App. 1st Cir.1984).
The evidence establishes that Doug Youngblood was working as an employee *920 of Tidewater inspecting and supervising the construction by Helm of the compressor station and that in this capacity Youngblood directed the installation of the tower.
There is no substantial evidence in this record to support the jury's factual determination that Tidewater was guilty of no negligence contributing to Blakeney's injury. We find this factual determination clearly wrong. We find the preponderance of evidence establishes Blakeney was injured by the negligence of Tidewater.

WAS BLAKENEY GUILTY OF CONTRIBUTORY NEGLIGENCE
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own safety and protection, that standard being that of a reasonable man under like circumstances. U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976); Straley v. Calongne Drayage & Storage, Inc., supra; Craft v. Caldwell Parish Police Jury, supra.
A workman who subjects himself to hazardous duties in order to perform his work is not guilty of unreasonable conduct by failing to avoid a known risk because to decline to do the work could subject him to the loss of his job which he needs for the support of himself and his family. Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir.1970). See also Brown v. White, 430 So.2d 16 (La.1983); Gradis L. Cutchall v. Great American Pump Company, et al, 460 So.2d 1106 (La.App.1984).
A workman whose duties require that he work in hazardous circumstances who is injured while doing his best to discharge those duties is not guilty of contributory negligence even though he is fully aware of the risk of injury to which he is subjected while performing his work. O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir.1973).
Blakeney was one of four Helm employees that received the order from Youngblood to mount the sling and go to the top of the tower. He therefore was not unreasonable to consider the work to be part of his duties which he was required to perform for Helm. The fact that he didn't wait for each of his co-employees to decline the performance of the task before he agreed to undertake it does not detract from the validity of this conclusion. Each of the Helm employees knew the task was required of him although the task only required that one of them undertake it. Any workman knows the failure to perform required duties assigned by his superior may endanger his job. Youngblood as supervisor for Tidewater was functioning as Blakeney's superior when he gave the order. Blakeney's conduct in undertaking the task was not unreasonable even though it was hazardous and subjected him to an unreasonable risk of harm.
There is no substantial evidence in the record to support the jury's finding that Blakeney was guilty of contributory negligence under the circumstances established at trial and this factual determination by the jury is clearly wrong.

ASSUMPTION OF THE RISK
In order for the doctrine of assumption of the risk to constitute a valid defense it must be shown the plaintiff understood the risk he incurred and the choice to incur it was entirely free and voluntary. Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3d Cir. 1974); Pollard v. Roberts, 306 So.2d 801 (La.App. 2d Cir.1975).
Blakeney undertook to ride on the end of a cable to the top of the tower and while there in a stopped relatively stable position to remove the shackle from the end of each of the other cables of the sling and to then be relatively gently lowered to the platform or ground. Normally each of the released cables would be in a steady straight hanging position following their release from the top of the tower and would create no great hazard to Blakeney as he was lowered from the tower. The risk inherent in *921 the performance of the task under those circumstances is the only risk assumed by Blakeney.
The risk to which Blakeney was subjected was the attempt to move the sling and lower it while one of the cables remained firmly attached to the tower followed immediately with the moving of the sling back to a position over the tower, which action caused the shackle on the end of one of the cables to swing into Blakeney's knee. Blakeney did not assume this risk as he had no reason to expect it to occur. We also conclude that Blakeney's undertaking the task was not entirely free and voluntary because it was undertaken by him pursuant to an order from a superior.
There is no substantial evidence in this record to support the jury's factual determination that Blakeney assumed the risk and this finding by the jury is clearly wrong.

QUANTUM
Blakeney seeks damages for permanent disability, pain and suffering, loss of future wages, and medical expenses. Home Indemnity Company, pursuant to the subrogation provisions of LSA-R.S. 23:1103, seeks a judgment for compensation paid by it to Blakeney in the amount of $21,213.23 and for $4,334.43 for medical expenses paid by it on Blakeney's behalf from any award received by Blakeney.
Blakeney had no disability or other medical problem with his right knee or leg prior to the accident. Because Blakeney believed the injury to his knee was not serious he did not go to the doctor until eight days after the accident. He worked for one month after the accident prior to undergoing significant medical treatment. During this one month period he was working in severe pain accompanied by swelling of the knee and frequent stiffening of the knee.
Blakeney underwent surgery on two occasions for treatment of his knee and these procedures were accompanied by almost a year of restorative physical therapy.
Dr. George D. Edwards, a general practitioner and Blakeney's family physician, saw Blakeney eight days after the accident. Blakeney was complaining about extreme pain in his knee and difficulty with walking. Dr. Edwards prescribed pain medication and instructed Blakeney to rest his right leg whenever possible. Blakeney called Dr. Edwards about three weeks later and told him his pain had increased. Dr. Edwards referred Blakeney to an orthopedic specialist.
That orthopedic surgeon, Dr. Douglas C. Brown examined Blakeney on October 11, 1979, and X-rays revealed a small tear on Blakeney's cartilage and some pathology in the kneecap. Dr. Brown performed surgery on October 16, 1979 to correct the deterioration of the kneecap. He performed a chondroplasty, which involves drilling holes in the kneecap and shaving the undersurface of the kneecap to promote healing. Blakeney was in a cast and on crutches for about one month after this surgery.
Blakeney returned to Dr. Brown on December 14, 1979 with knee pain and knee stiffening. Dr. Brown prescribed pain medication, fitted Blakeney with a compression knee sleeve to reduce swelling around the kneecap, and instructed Blakeney to avoid climbing stairs and hills. Dr. Brown saw the plaintiff on February 8, 1980 at which time the pain had became so severe Blakeney could barely walk. Dr. Brown performed a second operation on Blakeney's right knee on February 21, 1980. At this time Blakeney's right kneecap was totally removed. Blakeney was placed in a cast after the operation which was not removed for a month and he was ambulatory only on crutches for about six weeks following this accident.
Dr. Brown opined that Blakeney had recovered from the operation by April 22, 1980.
Dr. Brown recognized that Blakeney was still in some pain. Dr. Brown stated Blakeney had a 30% permanent partial disability of the right leg. Dr. Brown believes Blakeney is still capable of performing the full *922 time farming which he had engaged in prior to the accident, but he discouraged Blakeney from obtaining employment in the construction business, particularly where he was required to work off the ground.
While the operations relieved a substantial portion of the pain and disability caused by the accident, Blakeney's right leg was still substantially impaired at the time of trial. He is incapable of squatting for more than a few minutes, and he cannot sit down for any long period of time without his knee stiffening. Blakeney is unable to walk for long periods of time without his knee stiffening. He has difficulty climbing and going down hills and stairways. Blakeney's inabilities to squat, sit, walk, climb, and descend without difficulty makes it difficult for him to properly maintain the farm equipment which is essential to his farming operation. Because of his disability the maintenance work he must perform requires more time than it did before the accident. Blakeney's walking limitation has drastically curtailed his bird hunting, which was his favorite sport in which he engaged five or six times a week during hunting season prior to the accident. Blakeney is a farmer but prior to the accident worked part-time in construction when his farming did not require his presence. Blakeney continues to farm but has not sought work in the construction business since the accident because of his inability to squat and climb stairs. The fact that his wobbly right leg might cause him to fall from high places is another reason why Blakeney no longer does construction work. Immediately prior to the accident he was working approximately forty hours a week and earning $10.25 per hour. Blakeney cannot farm as well as he did prior to the accident because of his inability to move around with the same dexterity he had prior to the accident and because of his difficulty in maintaining his equipment essential to his farming operation.
An award for loss of future wages may be made on an injured person's ability to earn, rather than what he earned prior to the injury, and lost earnings may be assessed without calculating the exact amount of the pecuniary loss. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981).
Blakeney underwent two surgerical procedures for his knee injury and required medical care for at least seven months after the accident. Blakeney has a 30% permanent partial disability of the right leg as a result of his injury. Blakeney sustained substantial pain for many months following the accident and occasionally still has some pain.
We conclude the record supports an award of damages to Blakeney against Tidewater in the sum of $74,334.43 and that Home is entitled to $25,547.66 of this award.
We amend and recast the judgment appealed as follows:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that there be judgment in favor of HAFCO, INC. and against CLEO B. BLAKENEY and HOME INDEMNITY COMPANY rejecting plaintiff's demands.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of CLEO B. BLAKENEY and against TIDEWATER COMPRESSION SERVICE, INC. in the full sum of $74,334.43, together with legal interest from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that $25,547.66 of CLEO B. BLAKENEY'S judgment, together with the judicial interest on this amount, is awarded in favor of HOME INDEMNITY COMPANY pursuant to LSA-R.S. 23:1103.
TIDEWATER COMPRESSION SERVICE, INC. is cast for all costs of these proceedings.
NOTES
[1] 1. Was TIDEWATER COMPRESSION SERVICE, INC. and/or its agents, servants or employees guilty of any negligence which was the proximate cause of CLEO BLAKENEY'S injuries?
 YES NO

2. Was HAFCO, INC. and/or its agents, servants or employees guilty of any negligence which was the proximate cause of CLEO BLAKENEY'S injuries?
 YES NO
3. Was CLEO BLAKENEY guilty of any contributory negligence and/or assumption of the risk which was the proximate case of his injuries?
 YES NO
4. If you have answered either or both Interrogatory No. 1 or Interrogatory No. 2, "YES", and you have answered Interrogatory N. 3 "NO", then answer the following Interrogatory.
CLEO BLAKENEY and THE HOME INSURANCE COMPANY are entitled to $ 0.
[2] Tidewater has not established immunity under the compensation act and does not argue this defense in brief.