569 So.2d 246 (1990)
William CROW, Plaintiff-Appellee,
v.
Vanessa RAMBIN, Martin Rambin, and Jerald Rambin, Defendants-Appellants.
No. 21830-CA.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1990.
*247 Daryl Gold, Shreveport, for appellant.
Nelson W. Cameron, Shreveport, for appellee.
Before MARVIN, C.J., and FRED W. JONES Jr. and SEXTON, JJ.
MARVIN, Chief Judge.
In this action arising out of a battery, defendants appeal a judgment awarding $112,000 in personal injury damages, contending that the trial court should not have admitted hearsay testimony over their objection, that only one of the three defendants injured plaintiff, that plaintiff may not recover medical expenses paid by his girlfriend, and that the general damage award is an abuse of the trial court's discretion.
We amend to reduce the general damage award from $100,000 to $62,000 and affirm as amended.

FACTS
We summarize the trial court's findings of fact which are supported by the record and are not clearly wrong:
The attack on plaintiff occurred after dark during squirrel hunting season in October 1986 at a DeSoto Parish hunting camp. The campsite was owned by the family of the three defendants, Vanessa, Martin and Jerald Rambin, who are a sister and brothers. All litigants, including plaintiff "Buddy" Crow, are adults. About 15 others, including some children, had tents at the hunting campsite which was illuminated by lanterns and a central campfire.
Several weeks before the incident at the campsite, Crow had intervened in some manner to stop a fight between Martin Rambin and Martin's cousin, whom Martin was attempting to strike with a hoe at a place called the "pig pen." Several campers at the Rambin campsite apparently knew of the earlier incident at the pig pen. When Vanessa Rambin joined in the attack on Crow at the campsite she exclaimed, "Nobody hits my brother [Martin] and gets away with it." Another witness at the campsite heard either or both Jerald and Martin say that they would like "to beat the hell out of [Buddy Crow]."
On the day Crow was attacked he had hunted with friends, Billy Kellogg and Kellogg's son-in-law, Terry McMillon, using *248 McMillon's truck. When Crow and McMillon completed their late afternoon hunt they returned to Kellogg's home on Rambin Road. McMillon and Kellogg's 15-year-old son drove away before Crow did. Kellogg and Crow, in Kellogg's truck, attempted to follow and catch them, either to get Kellogg's son or Crow's hunting gear from McMillon's truck. The Rambin campsite was ¼ mile away.
Kellogg stopped at the campsite, hoping to locate McMillon's truck. Crow exited the truck to talk to a sometimes hunting companion, Gill, who was standing at the campfire. While Crow was conversing with Gill, Martin Rambin approached and struck Crow with his fist. Crow retreated and walked behind Kellogg's truck which was parked in the road near the camp entrance. The three defendants came after Crow, one or the other saying such things as "he ain't gonna fight," "let's kill him," "he ain't gonna hurt nobody" and "cut his guts out." Others came from the campsite, following the defendants toward Crow.
Crow, understandably alarmed, grabbed Kellogg's shotgun from the truck and fired into the air in an effort to forestall the attack and distance himself from the defendants. In moving away from the truck, Crow tripped and fell, at which time defendant Jerald Rambin and Cornelius Rambin [not a defendant] grabbed the shotgun which was eventually taken and held by Cornelius Rambin. Vanessa Rambin began stomping Crow about his right leg and knee and attempting to kick Crow in his testicles.
The attack on Crow ended when Kellogg and another intervened and forcibly restrained Vanessa. Kellogg and Crow then departed in Kellogg's truck. Kellogg's son later went to the Rambin campsite to retrieve Kellogg's shotgun, commenting to Martin Rambin while there that Martin was "wrong" to "jump on" Crow. Martin replied that Crow had been wrong to jump on him at the pig pen.
Recognizing conflicts in testimony, the trial court concluded that Crow did not "fight" with defendants who were demonstrably hostile toward him, and that the three defendants jointly attacked and injured Crow, who tried to retreat and avoid being injured.

HEARSAY OBJECTION
When Crow was asked what he did after Martin first hit him at the hunting camp, he said:
I asked him what was this all about, and he said "you know what you have done" and I said "I don't know, fellow, what you are talking about," and his brother starts hitting me, Jerald, and I said "the only thing I ever done to you was to break up a fight and keeping you from hitting your cousin with a hoe," because the boy had been messing around with a couple of other fellows' wives trying to make a pass at them.
Defendants objected to this testimony as inadmissible hearsay or opinion evidence. The trial court overruled the objection after Crow explained that the earlier incident "is what ... led up to why they assaulted me."
Defendants contend that Crow should not have been allowed to give "his opinion that the defendant, Jerald Lafitte, (sic) had been messing around with other fellows' wives trying to make a pass at them" (our emphasis) because this was inadmissible hearsay or opinion evidence from a lay witness and "highly prejudicial."
Gerald Lafitte was a friend of the Rambins and was present at the hunting camp but is not one of the defendants. Jerald Rambin is a defendant but it was Martin, not Jerald, who was stopped from hitting his cousin by Crow at the "pig pen." Apparently it was not Martin, but his cousin (unnamed in the record) who was alleged to have been "messing around."
Crow's testimony was not hearsay as defined in CE Art. 801 because it was not offered to prove the truth of the matter asserted, that is, that Martin's cousin had been "fooling around," but to explain the basis for defendants' demonstrated hostility toward Crow at the campsite.
CE Art. 701 allows a lay witness to express an opinion only if it is rationally *249 based on his perception and is helpful to a clear understanding of his testimony or the determination of a fact in issue. Defendants contend Crow's testimony did not satisfy these requirements and that, if it was otherwise admissible, it should have been excluded under CE Art. 403 because its probative value was substantially outweighed by its prejudicial effect.
To the extent that Crow's testimony can be construed as his "opinion" of the reason for the attack on him, it satisfies both requirements of Art. 701. Any prejudice arising from its admission was minimal since the person who had allegedly been "fooling around" was not one of the defendants.

SOLIDARY LIABILITY
Defendants Jerald and Martin Rambin contend they should not have been cast in solido with Vanessa because Crow's only injury was his knee injury and Jerald and Martin "were not assisting" when Vanessa kicked or stomped Crow's knee.
At the time of the 1986 battery, CC Art. 2324 provided in part:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Art. 2324 was amended in 1987 and now provides in part:
He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
The attack on Crow began when Martin hit him in the face. Witnesses at the campsite heard Martin and Jerald threaten to hurt or kill Crow. All three defendants advanced toward Crow after he fired a warning shot. The trial court obviously concluded that Martin and Jerald assisted, encouraged and conspired with Vanessa to injure Crow. The record supports this conclusion and the three defendants are solidarily liable for his injuries, notwithstanding that each did not physically strike Crow's knee. See and compare Ford v. Williams, 62 So.2d 838 (La.App. 1st Cir. 1953); Walker v. Champion, 288 So.2d 44 (La.1973); and Brossette v. Clofort, 481 So.2d 637 (La.App. 4th Cir.1985).

MEDICAL EXPENSES
Crow's medical expenses totaled about $6,700 and were paid from a joint checking account maintained by Crow and Joni Taylor, his former girlfriend, with whom he was then living. Before Crow's injury and after he returned to work, both he and Taylor deposited their income into the joint bank account. While Crow convalesced, only Taylor's income was deposited. Some of the medical bills were paid while Crow was not working. Others were paid after he returned to work. Taylor signed all of the checks and testified that her funds were used to pay some of the medical bills.
Defendants contend they are not liable for the full amount of Crow's medical expenses because some were paid "by other sources" [Taylor] and these payments "amount to a gift" to Crow. Defendants did not contribute to the collateral source and are not relieved of their liability for all of Crow's medical expenses by Taylor's payments of some of them. Weir v. Gasper, 459 So.2d 655 (La.App. 4th Cir.1984), writ denied.

GENERAL DAMAGES
Crow was attacked on a Saturday night. He had knee pain Saturday night and Sunday. On Monday, October 13, 1986, he saw Dr. Don Burt, a Shreveport orthopedic surgeon, who found Crow's right knee to be swollen and "loose" or unstable, indicating major ligament damage. The knee was not fractured, but two ligaments and the knee cartilage were badly torn. On October 14, Dr. Burt surgically repaired the ligaments, which had been torn from the bone, using sutures and pins to reattach them. The knee cartilage, or medial meniscus, was torn beyond repair and was surgically removed.
Crow was discharged from the hospital on October 18, 1986. His right leg was in a full leg cast for six weeks. During that *250 time and for three weeks after the cast was removed, he walked only on crutches. After the cast was removed, he began weight-lifting exercises to strengthen his knee and used warm soaks to reduce swelling.
Crow was discharged from Dr. Burt's care on December 13, 1986, two months after his injury. Dr. Burt found his knee was "quite solid, it was stable in all directions, he did not have any looseness to the knee, he had developed a good movement to the knee at that point and was in the process of developing good strength in the knee." Dr. Burt advised Crow to continue exercising his knee, which he did. While Crow was under the doctor's care, his girlfriend, Ms. Taylor, cared for him and did all of the housekeeping in the house they shared.
Crow, a welder, was out of work for about three months. At trial in August 1989, he testified he could stay in a kneeling position at work but could not repeatedly kneel and return to a standing position. He walks up stairs but has trouble going down stairs because his leg "wants to kick out" from under him. The pin that was left in his knee after surgery still causes him some pain. Dr. Burt did not consider the pain serious enough to remove the pin in 1989 but said there was a 50-50 chance that it would eventually need to be removed.
Dr. Burt explained that 80 percent of patients whose knee cartilage has been removed will develop mild arthritis in the knee over a period of 15-20 years. He could not and did not predict whether Crow will do so. He last saw Crow in May 1989, about three months before trial, when Crow came in "just to see how [his knee] was doing." Dr. Burt found that Crow had full movement in the knee, with slight tenderness in the area of the surgical pin, and a "trace of instability, which is expected in all these repairs." Dr. Burt testified:
[I]t was basically a good knee, and I thought that he had gotten a very good result from the repair. I did take X rays, and at this time, the X rays do not show any arthritic changes in the knee. I told him ... that he could go ahead and do his full work activity. I advised him that he might be expected to have some trouble if he just had to do repeated squats, particularly repeated squats with heavy weights, and that was really the only restriction on the activity.
Considering Crow's injuries and the effects of the surgery, as well as the 80 percent chance that he will develop minimal arthritic changes in his knee over the next 15 years, Dr. Burt opined that Crow has a 20 percent disability of his right leg.
On these facts, which defendants do not dispute, the trial court awarded Crow $100,000 in general damages. Defendants contend the award is abusively high because Crow has recovered reasonably well from the injury and the surgery.
Our review of a damage award for excessiveness focuses primarily on the facts before us in the particular record. We look to other cases only to determine whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Reck v. Stevens, 373 So.2d 498 (La.1979); Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987), writ denied.
Crow was hospitalized for six days and had surgery to remove his torn knee cartilage and to reattach two torn ligaments. He was immobile and in moderate to severe pain for about two months. He returned to work as a welder about three months after his injury. Over two years later, Dr. Burt described Crow's knee as "basically good" and restricted him only from repeated squatting. Crow continues to have intermittent pain from the surgical pin and has trouble walking down stairs. Dr. Burt's 20 percent disability rating of Crow's right leg takes into account the possibility that he will develop mild arthritis in his knee over a 15-year period. With these facts in mind, we consider the range of prior awards for similar injuries.
In Jones v. Sampey Bros. General Const., 544 So.2d 1192 (La.App. 5th Cir. 1989), the plaintiff, a welder, suffered knee and back injuries when he was momentarily pinned between two vehicles. After a torn cartilage was surgically removed from *251 his knee, he was restricted from prolonged squatting or kneeling and excessive stair-climbing. The injury also aggravated arthritis in his lower back. The trial court awarded $35,000 in globo for general damages and economic losses. The court of appeal found the award was abusively low because plaintiff proved about $26,000 in past and future economic losses. The appellate court increased plaintiff's recovery by that amount, while affirming the $35,000 award for general damages.
The plaintiff in Powell v. A. Copeland Enterprises, Inc., 508 So.2d 849 (La.App. 5th Cir.1987), was injured when she patronized a fast food store where several employees were fighting. She was pushed against a door and was twice knocked to her knees, causing pain in her neck, back and knees. She was conservatively treated for chondromalacia, or grating of her kneecaps in both knees, which her doctor estimated gave her an 8-10 percent disability in both legs. Her past and future medical expenses comprised $7,700 of the $40,000 in globo damage award, leaving $32,300 as general damages. The award was challenged by both litigants and was affirmed.
A $50,000 general damage award was affirmed as not being excessive in Wallace v. State Farm Mut. Auto. Ins. Co., 509 So.2d 466 (La.App. 3d Cir.1987), writ denied. Wallace had pain in his neck and both knees after an automobile accident. After his neck and right knee pain subsided, he continued to have pain in his left knee due to chondromalacia and a possible cartilage tear, for which he was treated with physical therapy and ice packs. He was out of work and in substantial pain for two months. He wore a leg brace for "an undetermined period of time." He eventually returned to work full-time after working part-time and in pain for some unspecified time. He continued to have pain with constant bending of the knees, preventing him from jogging, bicycling and playing ball, as he had formerly done. His doctor assigned him a 20 percent impairment of the left knee.
A knee injury was also considered in Blakeney v. Tidewater Compression Service, 463 So.2d 914 (La.App. 2d Cir.1985), writ denied. The jury rejected Blakeney's demands against both defendants. On his appeal, this court rendered judgment against one defendant for $70,000 in general damages, plus about $4,300 in medical expenses. Within six months of his injury, Blakeney twice had knee surgery, first to repair and then to remove his right kneecap. After the second surgery he wore a cast for a month and used crutches for six weeks. He returned to farming, his primary occupation, with less dexterity and more difficulty in maintaining his farm equipment than before his injury. He could not return to construction work, which he had done part-time before the injury. At trial, his right leg was still "substantially impaired" and he could not walk, sit, squat, climb or descend hills and stairs without his knee stiffening. The disability of his right leg was fixed at 30 percent.
While Crow was obviously in a great deal of pain for several months, and while he still has some physical impairment, he has had a relatively uneventful recovery from his injury and knee surgery, and has been able to return to most of his former activities without medical restrictions. On this record, we must find that the trial court abused its discretion in awarding general damages of $100,000.
Considering the circumstances of Crow's injury, surgery and recovery, and his residual impairment, we shall amend to reduce the general damage award to $62,000, the highest amount we would have affirmed as within the trial court's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).

DECREE
The general damage award of $100,000 is amended to $62,000. The judgment, as amended, is affirmed. Costs of the appeal are assessed to Crow.
AMENDED AND AFFIRMED.