574 So.2d 424 (1991)
UNITED STATES FIDELITY & GUARANTY COMPANY (Elton Bryant, Intervenor), Plaintiffs/Appellants,
v.
HI-TOWER CONCRETE PUMPING SERVICE, INC., et al., Defendants/Appellees.
No. 22035-CA.
Court of Appeal of Louisiana, Second Circuit.
January 23, 1991.
Rehearing Denied February 21, 1991.
Writs Denied April 26, 1991.
*427 Theus, Grisham, Davis & Leigh by Phillip D. Myers, Monroe, for plaintiff/appellant U.S. Fidelity & Guar. Co.
Walker & Walker by Carl F. Walker, Monroe, for intervenor/appellant Elton Bryant.
Davenport, Files & Kelly by Mike C. Sanders, Monroe, for defendants/appellees Hi-Tower Concrete Pumping Service, Inc., Larry Gene Manning, Continental Ins. Co. and The Fidelity and Cas. Co. of New York.
Sessions & Fishman by Louis L. Galvis, New Orleans, for defendant/appellee Royal Industries Inc.
Before MARVIN and FRED W. JONES, Jr., JJ., and PRICE, J. Pro Tem.
FRED W. JONES, Jr., Judge.
Plaintiff, United States Fidelity & Guaranty Company (USF & G) and Intervenor, Elton Bryant, appealed the judgment in favor of defendants, Larry Manning, Hi-Tower Concrete Pumping Service, Inc. (Hi-Tower Concrete), Continental Insurance Company, The Fidelity & Casualty Company of New York (Fidelity) and Royal Industries, Inc., Thomsen Division (Thomsen), in their action to recover personal injury damages and workers' compensation payments made as the result of injuries sustained in a *428 work-related accident.[1] Finding no error, we affirm.
Issues Presented
On appeal, plaintiff and intervenor assert the following assignments of error:
1) The trial court erred in rendering judgment in favor of Larry Manning where the polling of the jury revealed less than nine jurors concurred in answering special interrogatory # 2;
2) The jury erred in failing to find Larry Manning strictly liable;
3) The jury erred in finding Bryant guilty of victim fault;
4) The trial court erred in rendering judgment in favor of Larry Manning where the polling of the jury revealed less than nine jurors concurred in answering special interrogatory # 4;
5) The jury erred in finding Bryant guilty of contributory negligence;
6) The trial court erred in failing to instruct the jury on comparative negligence; and
7) The trial court erred in permitting the videotape of a "normal" cleanup operation to be shown to the jury over the objections of Bryant.
Factual Context
In this factually complex and voluminous proceeding, the record shows that Elton Bryant was employed as an apprentice carpenter for HLH Builders, Inc., a general construction company. HLH was engaged in an industrial construction project in Swartz, Louisiana and defendant, Larry Manning, the owner of a concrete pumping business known as Hi-Tower Three, had subcontracted with HLH to provide the concrete pumping services. A Thomsen 875 concrete pumping truck owned by Manning and operated by his employee, Richard Sherbino, had made the delivery of concrete for a foundation which was being constructed by HLH Builders. The concrete pumping truck was manufactured by Thomsen. On June 22, 1979, after the concrete pumping was completed, Bryant disconnected the hoses through which the concrete was pumped and returned them to the concrete pumping truck. As Sherbino was in the process of cleaning the concrete truck, Bryant began pulling gravel out of a valve located on the concrete pumping truck on his own initiative. As his left hand was in the valve box or transition, a flapper mechanism crushed it.
Bryant contends he was not warned by the operator to stay away from the valve box nor were there any warnings on the concrete pump warning persons not to place their hands in the valve box. A warning sign which had been placed on the concrete pumping truck by the manufacturer warning persons not to place their hands in the valve box had been painted over and was illegible. Manning, who had knowledge of the information provided by the warning sign and the fact it was painted over, had placed the concrete pump into operation without replacing the sign.
On June 23, 1980, USF & G instituted this action by filing a petition naming Hi-Tower Concrete as defendant. Plaintiff alleged that on or about June 22, 1979, it had in full force and effect a policy of workers' compensation insurance issued to HLH Builders, Inc. On that date, Bryant, an employee of HLH Builders, Inc., received accidental personal injuries at a construction site while working in the full course and scope of his employment. As a result of these injuries, plaintiff had paid workers' compensation benefits plus medical benefits to/or on behalf of Bryant. Plaintiff alleged it would pay to or on behalf of Bryant workers' compensation benefits and medical expenses for an undetermined future time. Plaintiff asserted the accident occurred when Bryant was assisting defendant's employee in cleaning out the concrete pump and the employee accidentally turned on the pump causing the injuries to occur. Plaintiff contended the injuries were incurred solely as the result of the *429 negligence of defendant and his employee and under La.R.S. 23:1101, it was entitled to recover against defendant all sums paid by it plus all undetermined future amounts. By amended petition plaintiff named Thomsen as defendant, alleging it was solidarily liable with Hi-Tower Concrete. Plaintiff asserted the Thomsen pump was defective in that it was unreasonably dangerous in normal use and this defective condition was the legal cause of the accident. Plaintiff contended Thomsen knew or was presumed to know of the defective condition contained in the pump and was strictly liable for the damages as its manufacturer.
In its answer, Hi-Tower Concrete alleged the pump was being cleaned by its employee who had not requested Bryant's help. Defendant asserted Bryant had been instructed to stand clear from the equipment and was also instructed not to put his hand or feet in the vicinity of the pump because it could cause injury. Despite these instructions, Bryant positioned himself so he could not have been seen by the employee and for unknown reasons placed his hand in the pump. Defendant contended the injuries were due solely to the negligence of Bryant. In the alternative, defendant alleged the accident was due to Bryant's contributory negligence and Bryant assumed the risk incidental to placing his hand in the pump as he knew or should have known the apparent and obvious risk of injury.
In its answer, Thomsen alleged the concrete pump was not in the same condition as when manufactured and, thus, no liability could be imposed upon this defendant. Defendant asserted Bryant's accident and injury were the result of the equipment being placed in abnormal use for which it was not designed or intended. If there was any defect or deficiency in the equipment at the time of Bryant's injury, it had developed after the equipment left the control of the manufacturer.
On April 28, 1981, Bryant filed a petition of intervention naming as defendants Hi-Tower Concrete and Thomsen. In particular, intervenor alleged there was no warning on the pump with respect to the danger of cleaning it and there was no cut-off switch on the pump for use when it was being cleaned. He asserted the pump was unreasonably dangerous in normal use due to negligent design and the failure to place a warning on the pump was the proximate cause of his hand being crushed. In the alternative, intervenor contended the accident and resulting injury were caused by the joint negligence of Thomsen and Hi-Tower Concrete.
On August 3, 1987, Bryant filed a third amending petition naming as defendants, Larry Manning, Thomsen and Manning's insurer, The Fidelity and Casualty Company of New York. Intervenor alleged the accident and resulting injuries were caused by the joint negligence of Thomsen and Manning d/b/a Hi-Tower Three. USF & G also amended its petition to name Manning d/b/a Hi-Tower Three and The Fidelity Casualty Company of New York as defendants.
At the trial on the merits, Bryant testified he had begun work with HLH Builders, Inc. as a common laborer and in three years had progressed to an apprentice carpenter. He had previously worked on two jobs where concrete pumpers had to be used for the pouring of foundations. Bryant stated that on the date of the accident he assisted in stretching out and placing the the concrete hoses to start pouring concrete. After completing the pouring, the hoses were separated, cleaned up and carried back to the truck. Bryant said he was assisted in carrying the hoses by Hoyt Garzia and several other employees. In cleaning the truck, the workmen proceeded to clean out the hopper. The concrete had hardened during the time the truck was in use and a rod was used to clean the concrete out through the bottom. Intervenor said he was around the hopper and valve box during the whole operation and the valve was operating. Bryant testified he speculated with Garzia as to what would happen if a man was to get his hand caught in the flapper valve. The flapper valve was moving at the time they were having this discussion.
*430 Intervenor stated he and Garzia had assisted the truck's operator, Sherbino, in getting water to the hopper. Garzia was holding the water hose, standing upon the valve box directing water down the hopper and Bryant was on the ground pulling gravel out of the valve box that the water did not wash out. Intervenor said the valve was not "flapping" at that time and this was the same procedure he had used on several occasions prior to that date. Sherbino was on the right side of Garzia with a rod, "rodding out" the hardened concrete in the hopper. Bryant believed that after a few minutes the flapper valve had quit moving. Bryant testified that as Garzia was holding the water hose, he squatted down on his knees in front of the valve box to reach in and drag the gravel out. Bryant did not know whether the operator could see him squatting by the valve box. Bryant stated the hopper contained little rocks and chips of concrete and he saw no reason why it would be dangerous to stick his hand in to remove the debris. Bryant testified he believed the flapper had been turned off because if it was safe enough to "rod it out," it was safe enough to stick in his hand. Bryant thought the operator had turned the flapper valve off but was not sure. Bryant estimated the flapper valve had stopped operation for approximately five minutes before his accident. When he had his arm placed in the valve box, Bryant heard a hissing sound and before he could remove his hand, the valve slammed shut and crushed his left hand.
Bryant and his co-employees were assisting in the cleanup of the concrete pumping truck as the operator had asked their foreman for some assistance. Bryant stated they were in a hurry to clean the truck so that it could be moved because it was positioned in a slab that was scheduled to be poured next. Bryant had assisted Manning in cleaning out a concrete pumping truck on a previous construction job and on that job he had also placed his hand in the valve box to remove debris. Bryant said he was never warned by Manning about the concrete pumping truck nor did he see any warning signs on the truck. Plaintiff stated the operator saw him near the truck when he brought the water hose over. However, the operator never told plaintiff to stay away from any part of the truck nor did he warn Bryant of the danger of placing his hand in the valve box. Bryant said he had helped Sherbino perform the cleaning operation on this particular concrete truck prior to his injury on two-three occasions. Bryant stated that in watching the flapper valve moving he knew it was dangerous and could cause serious injury if it closed on a hand or foot. This fact was obvious just from looking at the valve. Intervenor testified he was not told the valve had stopped operation and that it would not come back on. He admitted the decision to reach into the hopper to pull the gravel out was strictly his own.
Larry Manning testified that in June 1979 he was engaged in the concrete pumping business under the name of Hi-Tower III. Manning had two trucks, a Thomsen 875 and a Hercules Twin 30. The Hercules truck had been used on a previous construction site and was the first truck with which plaintiff had come in contact. Manning explained at construction sites employees of the general contractor handled the hoses and pipe while the operator operated the concrete pump. After the concrete pumping was completed, the contractor's laborers would break down the pipe and hoses while the operator washed the concrete pump. In cleaning the truck it was necessary to clean out the pump. Manning testified this was a "one man" job.
Manning had been contacted by a Thomsen sales representative and told of a truck in good condition in Florida. He went to Florida to inspect the vehicle and purchased it in early June 1979. The truck had been freshly painted and did not have any warning signs. Since he was unfamiliar with this equipment, he did not know what warning signs, if any, were on the truck. Manning ordered an operator's manual and other information. After receiving the manuals he saw there were signs missing from the truck. Manning had observed the painted-over signs on the *431 truck, but until he received the complete manual did not know what the signs said. Manning stated the truck had been in operation for approximately two to three weeks and he had relied on Sherbino, an experienced operator, for the operation of the pumper.
Even though he was aware of the missing warning signs, Manning did not order the signs prior to the accident. Manning stated he believed he received the operator's manual prior to the accident and had given it to Sherbino expecting him to examine it. Sherbino had already operated a Thomsen truck and Manning expected him to comply with the instructions in the operator's manual. Manning stated prior to the accident he told Sherbino to make certain no one came in contact with or in the vicinity of any dangerous areas of the concrete pumping truck and expected Sherbino to warn other workers.
In testifying as to the normal cleanup procedure on the Thomsen 875 truck, Manning stated after the pouring was finished the hoses were broken off the end of the boom, a sponge was placed in the boom which was then raised in the air. The pump was then placed in reverse, which caused all the concrete in the boom pipe to be drawn back into the hopper. At this point, the transition going from the valve box to the boom pipe was broken loose, exposing the flapper blade, and the concrete in the hopper was washed out on the ground. After the hopper was cleaned out, there was a ball valve that was turned and then a rake was used to clean out the valve box. In explaining "rodding out," Manning stated during a long pour concrete would set in the bottom of the hopper and harden. During the cleanup procedure it was necessary to use a metal tool to chip the concrete loose and wash it out. Manning testified the flapper valve should not function when the pump motor was on idle. In "rodding out" the hopper, the machine would either be at idle or could be set at a few hundred "rpms" above idle so that the pump would cycle slowly.
The flapper valve is a machine that moves back and forth with two pistons on each side. The pistons pull back and take the concrete out of the hopper, then push it forward one at a time. As one cylinder is pulling a load in, the other cylinder is pushing a load out. When each cycle was made, the flapper blade would shift so that the other cylinder could take a load in and the other one push its load out. The valve cover was removed so the concrete could be pumped out onto the ground from the hopper. If not, the concrete would be pumped back up into the boom.
Manning stated the flapper in the pump would not get all the concrete out of the hopper and valve box and the ball valve had to be activated to push the residue in the piston chamber. This was the last cleanup step after the hopper has been washed out. After the pistons come all the way forward, a tool was used to rake out whatever concrete is remaining in the valve box. The ball valve switch was located on the right or passenger side of truck, so when the operator of the truck went to the side to activate the ball valve he could not see the area immediately in front of the valve box. Thus, the operator would not know if someone walked up to the valve box.
Hoyt Garzia, a lead carpenter with HLH Builders, Inc., testified he and Bryant had worked together with a concrete pumping truck furnished by Manning at a previous construction site. Garzia stated it was normal procedure for the general contractor's employees to help pour the concrete and carry the hoses back to the truck. On the date of the accident, Garzia stated they had finished the pouring of the concrete and the operator was cleaning up the concrete pumping truck. Garzia testified the operator did not request anyone to help him and all Garzia did was help hold the water hose. Garzia stated he stayed on the ground at all times while Sherbino was going around the truck doing what he needed to do. When Garzia and Bryant were standing in front of the flapper valve, the flapper was moving and Bryant speculated what would happen if someone got his hand caught. Garzia replied it would probably "cut it off or squash it pretty good." Garzia did not remember whether the valve had stopped *432 moving before Bryant injured his hand and did not recall any warnings by Sherbino to stay away from the pumping machine or flapper valve. Garzia stated he believed Sherbino was to the rear and opposite side of the truck when Bryant's hand was injured. There was only a short period of time between their conversation and the injury. When Garzia first heard Bryant screaming, he did not take it seriously because they had just had that conversation and Garzia believed Bryant was joking. Garzia testified he did not feel he needed any instruction to stay away from the valve box due to its obvious danger. Garzia estimated approximately 10-15 minutes elapsed between the time he was holding the water hose and the time of the accident. Garzia said he was not watching the flapper box the entire time he was holding the water hose and did not know at what point the valve became stationary, if it did become stationary.
John Hunter, a former engineer with Thomsen, testified he was part of Thomsen's engineering design team in building a line of concrete pumps. Hunter had designed the Thomsen model HP 875 concrete pump in 1975-1976. The flapper valve was a key element in the design and was simply a directional control valve. The flapper blade valve was patented by Thomsen in the early 1960s and was used in the earliest models through the machines constructed in 1983. Hunter designed the HP 875 to meet the changing demands of the industry and the model was the most successful domestic pump of its kind at the time.
Hunter stated the operator was a key part in the operation of the machine. Hunter stated he had written the operator's manual that accompanied the machine and the manual was written specifically for the operator. One of his purposes in writing the operator's manual was to try to make certain that no one would get injured by coming in contact with the machine. He also believed clear warning signs had to be attached to the machine.
Hunter testified there was an opening from the hopper to two cylinders which sat under the hopper; one of the cylinders was retracting while the other was extending. Hunter explained the flapper blade switched sides due to a push/pull mechanism which sensed the position of the right cylinder. The cylinders reversed simultaneously so it changed over in one quick motion. Hunter testified that lowering the speed of the engine while the pump was on would not stop the pump. Rather, the pump had its own controls and there was a separate on/off switch. If the machine was in the pumping mode, slowing down the engine speed would slow down the frequency with which the flapper blade cycled from one side to another. However, it was not possible to stop the flapper blade from cycling all together merely by slowing the speed of the engine or lowering the "rpms." At full engine "rpms" and full hydraulic pump volume, the machine operated at approximately 50 strokes a minute. When the 875 was assembled and distributed, there was a pre-set lower range of engine "rpms" set on the engine in that it would not go below 900-1000 "rpms." At that frequency, depending upon where the volume output of the hydraulic pump was set, it dropped to 20 strokes per minute. If the volume output of the hydraulic pump was lowered to its lowest point, it would not cycle at all.
Hunter testified the only time the valve is exposed was during the cleaning process. If the machine was not properly cleaned, the concrete hardened and the machine would be inoperable. Hunter did not put a guard in front of the flapper blade since it would have acted as an obstruction to the primary purpose of the pump in the cleaning procedure. Rather, the decision was made to simply warn everyone to keep out of the area. Hunter testified the valve or flapper box was the last portion to be cleaned and had an access door on the side and an opening in front. The majority of the excess material was discharged through the front because it was "pretty runny." The operator would then be left with the task of raking the residue out of the area in which the flapper blade was located. After that step, the machine was clean and ready for its next use.
*433 Hunter testified the main control panel for the truck was located on the passenger side and the secondary control panel was located on the driver's side. Controls were placed on both sides of the truck for operator convenience. The switch that activated the ball valve was also located on the passenger side. Hunter testified a warning sign, "Warning, DO NOT PLACE HANDS IN VALVE BOX AT ANY TIME!" should have been located above and to the right of the flapper valve itself. Hunter stated the warning sign he designed to have on the machine was intended to protect not only the operator but persons who were not familiar with concrete trucks. Based upon his reading of Sherbino's deposition, Hunter believed the pump was in the cleanup mode at the time of the accident. Sherbino had gotten through the cleaning process to where he was at the pump, had opened the transition discharge at the front of the flapper valve, had lowered the stroke rate of the machine to some level and had rotated the lever of the ball valve which would push both pistons forward. By lowering the stroke rate of the machine, the action of the flapper valve blade itself would not be materially affected in the speed in which it moved, but there would simply be fewer strokes.
Hunter testified as the machine was designed and manufactured, the speed with which the blade would switch sides would never change due to different speed of the engine or the pump. The speed with which the blade would throw when it did move was approximately two-tenths of a second to move from one side of the valve to the other. When Sherbino reduced the speed of the pump or lowered the speed of the strokes, this would not have any effect on the actual speed the blade moved, rather the blade would not move as often at the lower stroke rate. The maximum interval Sherbino could have reduced the stroking of the pump would have been to approximately two strokes per minute or thirty seconds per stroke. Based on information Hunter had received about the accident, he believed the machine was operating exactly in the way it was manufactured.
Richard Sherbino, the operator of the concrete pumping truck, testified by deposition. Sherbino had experience with concrete pumps and had worked for Manning approximately one month prior to the accident. It was his understanding his job included driving the truck, running and cleaning the pump. Sherbino did not want help since he did not like anyone being around machinery he operated. Sherbino allowed the laborers to help retrieve the hoses or stretch a hose for an exterior water source but did the actual cleaning of the pump himself.
On the date of the accident, Garzia asked Sherbino if he needed help and Sherbino asked him for access to water. Garzia was advised by Sherbino he did not need any assistance. Sherbino did not recall Bryant around the truck until the accident occurred. Sherbino testified after finishing the pour he was in the process of cleaning up the truck. He lowered the "rpms" at the control box and was proceeding to the other side of the pump to do the final cleaning of the transition area when he heard Bryant yell. Bryant told Sherbino he had placed his hand in the valve box to retrieve a shiny rock. Sherbino stated during the cleanup procedure before the "rpms" were lowered, the flapper blade would shift approximately every 10-15 seconds. Sherbino had washed out the hopper and his next step was to lower the "rpms" to actually clean out the excess. Sherbino said the pump never stopped pumping until it was actually turned off and testified he had not even gotten to raking out debris when the accident occurred. Sherbino was going to clean the excess rock before he actually shut the pump off so he could clean each side of the transition. Sherbino planned to use the switch to put the valve at one side or the other, allowing him to use his rake and clean out the rock. Sherbino admitted he did not warn anyone the flapper might cause injury, but explained that was the reason he cleaned his own pump. Sherbino stated had he seen Bryant, he would have advised him to get away from the machine. Sherbino said Manning advised him to keep others away from the vehicle and he did not see anyone *434 close to the transition area. Sherbino had operated that model of truck before working for Manning and had read the operator's manual within three years of the date of the accident.
After reviewing the testimony and evidence, the jury rendered a verdict in favor of defendants. The jury interrogatories revealed it was unanimous in finding the concrete pump was not defective and that Thomsen was not liable under strict liability. The jury found Manning d/b/a Hi-Tower Three was not liable under strict liability by a vote of 9-3. The jury also voted 9-3 in finding that, while a preponderance of the evidence established that Manning d/b/a Hi-Tower Three was guilty of negligence which was the proximate cause of Bryant's injuries, a preponderance of the evidence established Bryant was guilty of victim fault. The jury was again unanimous in finding by a preponderance of the evidence Bryant was guilty of negligence which contributed to his injuries. After the jury reached its verdict, the trial court rendered judgment in favor of defendants and dismissed the numerous cross-claims and third-party demands between the parties.
Legal Principles
An appellate court may not set aside a trial court's or jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. Esco, 549 So.2d 840 (La.1989) and White v. McCoy, 552 So.2d 649 (La.App. 2d Cir. 1989).
Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case and the relationship of the parties. The legal duty is the obligation to conform to the standard of conduct of a reasonable man under like circumstances. Negligence in each case must be determined according to the particular facts and circumstances therein. Once the applicable standard of care is established, negligence is a question of fact for the trier-of-fact to determine. Causation is also an issue of fact and depends upon the individual facts and circumstances of the case. White v. McCoy, supra; Schoonmaker v. Capital Towing Company, 512 So.2d 480 (La.App. 1st Cir.), writ denied, 514 So.2d 458 (La.1987), and Blakeney v. Tidewater Compression Service, 463 So.2d 914 (La.App. 2d Cir.), writ denied, 467 So.2d 535 (La.1985).
A pure comparative fault system was adopted by this state in 1979 by Act 431, which became effective on August 1, 1980. Since this accident occurred in 1979, before the effective date of comparative negligence, comparative negligence was not applicable and the defense of contributory negligence was available. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985), and Smiley v. Sikes, 543 So.2d 1084 (La.App. 2d Cir.), writ denied, 548 So.2d 326 (La. 1989).
Contributory negligence has been defined as conduct of the plaintiff which falls below the standard of care to which he should adhere for his own protection. A defendant who claims contributory negligence as an affirmative defense must prove by a preponderance of the evidence that the injured party failed to act as a reasonable and prudent person and his negligence was the legal cause of the accident. The threshold inquiry in determining legal cause is whether the act was a substantial factor in causing the accident. Contributory negligence is never presumed. Such negligence on the part of plaintiff must be proven as any other fact by a preponderance of the evidence. The determination of contributory negligence is a factual matter lying within the discretion of the trier-of-fact and will not be disturbed on appeal in the absence of manifest error. Day v. South Line Equipment Company, 551 So.2d 774 (La.App. 1st Cir.), writ denied, 553 So.2d 474 (La.1989), and McCaskill v. Welch, 463 So.2d 942 (La.App. 3d Cir.), writ denied, 466 So.2d 469 (La.1985).
La.C.C. Art. 2317 provides:

*435 We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....
Liability under C.C. Art. 2317 is based, not upon negligence, but upon legal fault. The liability imposed is a consequence of the fact of ownership and custody in itself and not of the breach of a duty. In order to recover under C.C. Art. 2317, the plaintiff need only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect, that is, it occasioned an unreasonable risk of injury to another, and that his injury was caused by the defect. The mere fact that a thing creates a hazard does not necessarily mean it is defective within the meaning of strict liability. The key word is "unreasonable" and plaintiff must show the risk created was unreasonable under all the circumstances. The owner or custodian of a defective thing may escape liability under C.C. Art. 2317 only by showing the harm was caused by the fault of plaintiff, fault of a third person or irresistible force.
A plaintiff seeking to recover under C.C. Art. 2317 must prove the defect complained of was a cause-in-fact of the injury. A defect is a cause-in-fact if it is a substantial factor in bringing about the harm. Neither knowledge of the defect nor any particular act or omission by defendant is a prerequisite to a finding of liability. Loescher v. Parr, 324 So.2d 441 (La. 1975); Trabeau v. Mack Trucks, Inc., 543 So.2d 1381 (La.App. 1st Cir.), writ denied, 550 So.2d 651 (La.1989); Tracy v. Jefferson Parish, 523 So.2d 266 (La.App. 5th Cir. 1988), writ denied, 530 So.2d 569 (La. 1988), and Campbell On Behalf of Campbell v. State, 439 So.2d 1175 (La.App. 4th Cir.), writ denied, 443 So.2d 588 (La.1983).
An examination of the jurisprudence reveals there has been some confusion as to the exact nature of defenses available to the defendant under the articles imposing strict liability. As noted above, fault of the victim is a defense to a claim of strict liability and means the conduct of the victim was a substantial factor in causing the injury complained of. It has been held that assumption of the risk and contributory negligence are the two aspects of victim fault in our jurisprudence. Although some cases have equated victim fault to contributory negligence, others have held ordinary contributory negligence is not available as a defense in a strict liability action based upon La.C.C. Art. 2317. Rather, victim fault was usually in the form of assumption of the risk, that is, voluntary and unreasonable use of the product with full knowledge and appreciation of its defect and the danger involved. It must be shown that plaintiff voluntarily and unnecessarily exposed himself to a known danger. After the adoption of comparative negligence, the doctrine of assumption of risk no longer has a place in Louisiana tort law. Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); Rozell v. Louisiana Animal Breeders Cooperative, Inc. 496 So.2d 275 (La. 1986); Ruffo v. Schwegmann Brothers, Etc., 424 So.2d 470 (La.App. 5th Cir. 1982); Payne v. Louisiana Department of Transportation, Etc., 424 So.2d 324 (La.App. 1st Cir.1982), and Verrett v. Cameron Telephone Company, 417 So.2d 1319 (La.App. 3d Cir.), writ denied, 422 So.2d 164 (La.1982).
Strict Liability
Plaintiff and intervenor argue the jury erred in failing to find defendant, Manning, strictly liable. They contend the Thomsen 875 concrete pumping truck was defective and unreasonably dangerous for normal use because of the failure of Manning to replace the warning signs before placing the truck in operation. It is elementary that the duty to warn is intended to protect users against those hazards which are not obvious or readily observable with the use of ordinary diligence.
The record reflects that when Sherbino removed the flapper valve cover in order to complete the cleaning process after the pouring job was completed, the flapper valve was then visible. The movement of the flapper valve back and forth *436 was readily observable to bystanders. Further, the danger of inserting a hand into the flapper valve was obvious, as evidenced by Bryant's speculation with Garzia as to what would happen if one placed his hand in there, when both men were standing in front of the valve watching it operate. As the hazardous condition of this valve was readily observable, the lack of a warning did not render it unreasonably dangerous to normal use. Therefore, the failure of Manning to replace the warning signs before placing the truck into use did not make the truck defective so as to justify a finding of strict liability under La.C.C. Art. 2317. Furthermore, as will be subsequently discussed, the fact that Bryant observed the hazard prior to inserting his hand into the flapper valve establishes the defect, if any, of the machine created by the absence of the warning was not a cause-in-fact of the accident. Even if the machine was arguably defective due to the absence of the warning, the lack of the warning did not cause Bryant's injury since he had unquestionably observed the hazard before he put his hand in the valve box.
We note that any contention the defendant was negligent in his failure to replace the warning signs before placing the truck in operation would be subject to the same deficiencies as the contention of strict liability. Since the danger of placing one's hand into the valve box was obvious and readily observable by a party exercising ordinary prudence, defendant had no duty to warn and thus was not negligent in failing to warn. Although the jury erroneously found defendant was guilty of negligence, that error is harmless in light of the subsequent finding of contributory negligence and/or victim fault.
Contributory Negligence and Victim Fault
As noted above, a short time prior to inserting his hand into the valve box, Bryant and a co-worker, Garzia, watched the flapper valve in operation and had discussed the danger presented by that flapper valve if a hand was inserted therein. Bryant speculated as to what would happen to a hand if it were placed in the flapper valve. Garzia replied the hand would most likely be "squashed." The conduct of Bryant in inserting his hand into the flapper valve after making that observation constituted contributory negligence sufficient to bar his recovery against defendants under any negligence theory.
Further, it appears Bryant's conduct was sufficient to rise to the level of a voluntary knowing assumption of the risk. To assume a risk, one must knowingly and voluntarily encounter a risk which caused his harm and must understand and appreciate the risk involved and accept it as well as the inherent possibility of danger because of the risk. In this case, Bryant was not ordered by his supervisor or requested by the operator of the truck to assist in the cleanup operation. Rather, the testimony established the normal procedure was for employees of the general contractor to assist in breaking down the hoses and return them to the truck. It appears Bryant was not seen by the operator of the truck. The operator had only requested Garzia to assist him in obtaining a water hose in order to proceed with the final cleanup. Bryant did not make his presence known nor did he request the flapper valve be shut down in order for him to assist in cleaning out any loose gravel remaining in the valve. Under these circumstances, it is clear Bryant thought he could quickly clean the valve out and pull his hand from danger before the flapper valve caught him. Although it is not clear from the testimony whether the flapper valve had been completely stopped or had merely been slowed down, it is obvious Bryant miscalculated the speed of the flapping operation of the valve and this was the cause of his injury. Bryant knowingly and willingly encountered the risk that the flapping valve would catch his hand and this assumption of the risk constituted victim fault which would act as a total bar to his recovery. Thus, we find no error in the jury's conclusion that Bryant was guilty of contributory negligence and victim fault.
*437 Polling of the Jury
Plaintiff and intervenor argue the trial court erred in rendering judgment in favor of Manning where the polling of the jury revealed less than nine jurors concurred in answering special interrogatory No. 2 and less than nine jurors concurred in answering special interrogatory No. 4.
In interrogatory No. 2, the jurors found by a vote of 9-3 that Manning was not liable under strict liability and found in interrogatory No. 4 that Manning was guilty of negligence, which was a proximate cause of Bryant's injury, by a vote of 9-3. In brief, plaintiff and intervenor note that after the jury responses to the interrogatories were read by the court, USF & G requested the jury be polled. In response to this request, the judge submitted a form to each juror with instructions to the jury to indicate their answer to each interrogatory. As shown by the written forms filed into the record, in response to interrogatory # 2, four jurors voted "Yes" and eight jurors voted "No." In response to interrogatory # 4, eight jurors voted "Yes" and four jurors voted "No." After counting these votes, the trial court did not send the jurors back for further deliberations but merely attempted to take another oral poll. Plaintiff and intervenor argue it is obvious that at least one of the jurors became confused during the second oral polling of the jury since the minute entry indicates the second polling revealed three jurors voted "Yes" and nine "No" in response to interrogatory # 2 and eight jurors voted "Yes" and four jurors voted "No" in response to the fourth interrogatory. Following this polling, the trial court still did not instruct the jury to retire for further deliberations, but dismissed the jury and subsequently rendered judgment in favor of defendants. The parties argue the trial court erred in rendering judgment where it was unclear whether eight or nine jurors voted that Manning was not strictly liable. Thus, as the jury did not return a valid verdict, this court must make a res nova decision based upon the record.
There is no statutory or codal authority in Louisiana which provides for jury polls in civil cases, whereas polling is authorized in criminal cases when requested by the parties. Rather, the right has been recognized in civil cases jurisprudentially. The purpose of polling is to determine that all jurors voted and whether a sufficient number voted in favor of a verdict as required by law. If the polling reveals the number of votes is insufficient to sustain a verdict, the judge may, in his discretion, order the jury to re-deliberate, declare a mistrial or grant a new trial. Acosta v. Pendleton Memorial Methodist Hospital, 545 So.2d 1053 (La.App. 4th Cir.), writs denied, 551 So.2d 637 (La.1989) and 551 So.2d 638 (La.1989) and McCarter v. Liberty Mutual Insurance Company, 436 So.2d 726 (La.App. 4th Cir.), writ denied, 440 So.2d 145 (La.1983).
The inconsistencies between the verdict form and the results of the polling would ordinarily have warranted the trial court require the jury to retire for further deliberations before rendering judgment. Obviously, such clarification would have been desirable and it is an error which should have been addressed by the trial court. However, as the jury correctly concluded that Bryant was guilty of victim fault and of negligence which contributed to his injury, any error by the trial court in its handling of inconsistencies between the verdict and the poll was harmless error. In other words, as Bryant was clearly guilty of contributory negligence and victim fault, the negligence or strict liability of defendant was of little consequence and the verdict errors related to those findings were harmless error.
While we are affirming the judgment of the trial court based upon the jury verdict, we note the result would have been the same had this court set aside the jury verdict and conducted a res nova examination of the record. The evidence presented at trial clearly and convincingly established a significant level of victim fault and contributory negligence which would preclude any finding in favor of plaintiff and intervenor.
Admission of Videotape
Intervenor argues the trial court erred in permitting the videotape of a "normal" cleanup operation of the concrete pumping *438 truck to be shown to the jury over his objections. Defendants were permitted to show to the jury a videotape of the cleanup operation of a Thomsen 875 concrete pumper in order to familiarize them with the nature of the equipment and the normal cleanup operation. Bryant had filed a motion in limine objecting to the showing of the tape to jury because of the fear of a prejudicial impact due to the significant differences from the cleanup of the concrete pumper at the construction site at the time of this accident which was apparently denied by the trial court. In brief, intervenor argues the videotape was damaging in that there were numerous differences between the procedure shown in the videotape and the actual procedure used at the construction site.
The record demonstrates the trial court admonished the jury before viewing the videotape that the sole purpose for its viewing was to show how a machine of that type operated. The court stated the videotape was not intended to depict how that particular machine in question was operated on the date of the accident and it did not pretend to show the jury where the witnesses were located or what they were doing on that date because that testimony had to come from the witnesses themselves. The court further stated it was not necessarily the sequence of events that had occurred on the date of the accident, but rather was to be viewed simply as an aid so the jury could see how the concrete pumping truck operated.
The admissibility of motion pictures or videotapes is largely within the discretion of the trial judge. In determining the admissibility of such demonstrative evidence, the trial court must consider whether the videotape accurately depicted that which it purported to represent and whether it would aid the jury's understanding. Against those factors, the trial court must consider whether the videotape may mislead the jury or whether its probative value is outweighed by its prejudicial effect. LaFleur v. John Deere Company, 491 So.2d 624 (La.1986) and Burk v. Illinois Central Gulf Railroad Company, 529 So.2d 515 (La.App. 1st Cir.), writ denied, 532 So.2d 179 (La.1988).
This court has viewed the videotape and finds the trial court did not abuse its discretion in permitting the jury to view it, particularly in light of its limiting instructions admonishing the jury it was to be solely used as an aid in familiarizing them with the equipment to assist them in comprehending the complex testimony. Considering the probative value of the tape and the court's clear instructions to reduce any possible prejudicial impact of that tape, we do not find the probative value of the videotape was outweighed by any possible prejudicial effect. The testimony as to the operation of the concrete pumping truck was abstract and extremely complicated, so that the viewing of the actual equipment was beneficial to the jury in understanding the manner in which the accident occurred. Thus, the trial court did not abuse its discretion in its admission of the videotape into evidence.
Decree
For these reasons, the judgment of the trial court in favor of defendants is AFFIRMED at plaintiff's and intervenor's costs.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, BROWN, PRICE, Ad Hoc and FRED W. JONES, Jr., JJ.
Rehearing denied.
NOTES
[1] The record reflects the proper defendants are Larry Manning and Fidelity. Manning was doing business as Hi-Tower III on the date of the accident and did not form Hi-Tower Concrete Pumping Service, Inc. until September 1979, several months following the accident. Fidelity, a member of the Continental Insurance Group, admitted it was the carrier for Manning.