617 So.2d 505 (1993)
Police Officer and Mrs. John R. LAPER
v.
BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS, et al.
No. 91-CA-1481.
Court of Appeal of Louisiana, Fourth Circuit.
January 28, 1993.
Rehearings Denied May 12, 1993.
*506 Gothard J. Reck, Hugh C. Uhalt, Uhalt and Reck, New Orleans, for plaintiffs/appellees.
Mickey S. deLaup, Jeffrey K. Warwick, Bernard, Cassisa, Saporita & Elliott, Metairie, for defendant/appellant, Furrow Auction Co.
Sidney J. Hardy, Lisa Miley Geary, Campbell, McCranie, Sistrunk, Anzelmo & *507 Hardy, Metairie, for defendant/appellant, Cincinnati Ins. Co.
Patricia A. Traina, E. John Litchfield, Berrigan, Danielson, Litchfield, Olsen, Schonekas & Mann, New Orleans, for defendant/appellant, third-party defendant/appellee, Reliance Ins. Co.
Donald A. Hammett, John V. Baus Jr., Hammett & Baus, New Orleans, for third-party plaintiff/appellant, First State Ins. Co.
Before BARRY, WARD and ARMSTRONG, JJ.
ARMSTRONG, Judge.
This suit arises out of a personal injury action instituted by plaintiffs, former New Orleans Police Officer John R. Laper and his wife, against a number of defendants, including Furrow Auction Company ("Furrow"), and its insurers, Reliance Insurance Company ("Reliance") and Cincinnati Insurance Company ("Cincinnati"). Following a bench trial judgment was rendered in favor of the Lapers and against Furrow, Reliance and Cincinnati. Furrow, Reliance and Cincinnati appeal. Third-party demands filed by First State Insurance Company ("First State") against Furrow, Reliance and Cincinnati were dismissed by the trial court. We now reverse in part and affirm in part.
After the completion of the Louisiana World's Exposition (LWE) LWE, which had filed for Chapter 11 bankruptcy, contracted with Furrow to conduct an auction in which certain assets of LWE would be auctioned to the highest bidder, including Monorail Station No. 3. The auction was held January 3, 4 & 5, 1985. The terms of the sales required purchasers to remove the items from the fair site. This was by order of the U.S. Bankruptcy Court, which would not allow LWE to expend monies to dismantle and deliver the items sold. The monorail station, a large structure constructed of steel beams, had to be dismantled. The monorail station was purchased at auction by Mr. L.C. Brown, d/b/a Brown's Auto Ranch.
After the auction was concluded, representatives of Furrow remained on the site until January 11, 1985 to collect monies for items sold at the auction. The fair site was secured by fences and other barricades until the middle of January, 1985, when fences and barricades were removed by purchasers. Sometime in the late morning or early afternoon hours of January 25, 1985, while patrolling on the riverfront where Monorail Station No. 3 was being dismantled, Officer John Laper was severely and permanently injured when a steel beam fell on his patrol car. Photographs taken immediately following the accident show no barricades around the monorail station site.
The Lapers filed suit against numerous defendants, including LWE, its primary insurer U.S.F. & G., and its excess insurer, First State Insurance Company ("First State"), and L.C. Brown d/b/a Brown's Auto Ranch. First State filed a third-party demand seeking indemnification from Furrow and its insurers. The Lapers then filed a fourth supplemental and amending petition naming Furrow and its insurers as defendants. U.S.F. & G., First State and Brown settled with Mr. Laper before trial.
Following a bench trial judgment was rendered finding L.C. Brown, d/b/a Brown's Auto Ranch, Furrow and LWE each to be at fault in equal percentages, 33 1/3%. Mr. Laper's damages were assessed at a total of $2,234,514.00. Mrs. Laper's damages for loss of consortium were assessed at $150,000.00. The final judgment awarded Mr. Laper $744,838.00 and Mrs. Laper $50,000.00 against Furrow and its insurers, Reliance and Cincinnati. First State's third-party claims against Furrow, Reliance and Cincinnati were dismissed by the trial court.
This court's function on appellate review is to determine whether the evidence was sufficient for the trial court's findings, and whether those findings were clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

*508 LIABILITY OF FURROW
At the outset we note that this case does not involve strict liability under La.C.C. art. 2317. Furrow at no time had the care, custody and control of the monorail station. Any liability must be grounded on a general negligence theory under La.C.C. art. 2315. Louisiana employs the duty-risk analysis to determine liability in negligence actions. For liability to attach a plaintiff must establish that:
(1) The conduct in question was a cause-in-fact of plaintiff's harm;
(2) The defendant owed a duty to plaintiff;
(3) The duty owed was breached; and
(4) The risk or harm caused was within the scope of the breached duty.
Fox v. Board of Supervisors of L.S.U., 576 So.2d 978 (La.1991); Mart v. Hill, 505 So.2d 1120 (La.1987); Coblentz v. North Peters Parking, Inc., 533 So.2d 98 (La.App. 4th Cir.1988).
The dispositive factor in the instant case is the existence of a duty on the part of Furrow to prevent this type of harm to plaintiff. Generally, a legal duty is an obligation to conform to the standard of conduct of a reasonable man under like circumstances. Gibson v. Faubion Truck Lines, Inc., 427 So.2d 68 (La.App. 4th Cir. 1983); Blakeney v. Tidewater Compression Service, Inc., 463 So.2d 914 (La.App. 2d Cir.1985), writ denied 467 So.2d 535 (La.1985); Palmer v. Bartley, Inc., 430 So.2d 118 (La.App. 3rd Cir.1983). Whether a legal duty is owed by one party to another depends on the facts of circumstances of each case and the relationship of the parties. U.S. Fidelity & Guaranty Co. v. Hi-Tower Concrete Pumping Service, Inc., 574 So.2d 424 (La.App. 2d Cir.1991), writs denied 578 So.2d 136, 137 (La.1991).
Duty may also be created by statute. Crowe, Anatomy of a Tort, 22 Loy. L.Rev. 903 (1976). However, neither the Louisiana codal articles nor the statutes dealing with auctions, La.C.C. art. 2601 et seq. and La.R.S. 37:3101 et seq., impose a duty on an auctioneer to supervise the dismantling and/or removal of auctioned property.
In its reasons for judgment the trial court found that Furrow had a duty under its contract with LWE to remain at the site until the dismantling or demolition of the monorail station, to properly supervise demolition of the monorail station, and to prevent persons lawfully in the vicinity from being subjected to injury from falling material. The court found that Furrow breached those duties.
We will assume for the sake of argument that plaintiff would have been within the ambit of protection of Furrow's duties under its auction contract with LWE. The Auction Agreement or contract provided in pertinent part:
WHEREAS, Furrow represents that it possesses the personnel, experience and capability to conduct an auction of certain of LWE's assets as described hereinafter and pursuant to the terms and conditions contained herein;
NOW THEREFORE, in consideration of the foregoing and of the covenants and agreements hereinafter contained, the parties hereto agree as follows:
* * * * * *
11. Furrow shall require all purchasers to fully pay for, claim and remove property purchased with[in] seven (7) days of the auction date, provided however that any purchaser(s) of the Petroleum Pavilion, the United States Pavilion, three (3) monorail stations, three (3) oases and/or the LWE concession shells shall have forty-five (45) days in which to claim and remove said properties. In the event purchasers do not fulfill their obligations of performance and/or payment under the terms of the auction sale, Furrow shall have the authority to reclaim and resell the affected property at the best price obtainable or return to LWE upon demand any property not paid for or claimed and removed pursuant to this paragraph.
* * * * * *
12. LWE shall be obligated to provide security for all property sold at this auction *509 but not claimed or released for a period of seven (7) days following the auction.
* * * * * *
16. This Agreement shall terminate upon a full and final accounting and payment by Furrow to LWE for all property sold pursuant to the Agreement and not returned to LWE pursuant to paragraph 11 of this Agreement.
Plaintiff maintained that Paragraph 11 of the agreement required Furrow to oversee and supervise the removal of the monorail station, and to exercise reasonable care in doing so. Furrow maintains that this clause was in the contract simply to bind Furrow to make removal of the property a condition of the sale as per the order by the U.S. Bankruptcy Court authorizing the sale. It is clear that the Auction Agreement by itself did not clearly express the true intent of the parties as to whether the duty to supervise and be responsible for the demolition and removal of the monorail station was placed on LWE, Furrow or assumed by both. Therefore, the trial court properly allowed extensive parol evidence in an effort to determine the intent parties. See Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981).
An auction brochure prepared by Furrow contained the notation that:
All Buyers of buildings will be required to meet state and local requirements for permits, insurance, etc.
Plaintiff contends this is evidence that Furrow had a duty to insure that purchasers of the buildings, including monorail stations, had required permits and insurance. Furrow maintains this language was placed in the brochure because of the order of the U.S. Bankruptcy Court. The Bankruptcy Court order did contain a requirement that buyers be notified that they must "obtain the necessary permits from City or State authorities."
The auction guide printed by Furrow contained excerpts from the order of the U.S. Bankruptcy Court, identified as such, stating that immovable property "must be removed by the Buyer completely to the slab," and that all potential buyers must "obtain the necessary permits from City or State authorities."
Sam Furrow, the owner of Furrow, testified that his interpretation of the clause of Paragraph 11 that states "Furrow shall require all purchasers to ... remove property purchased ..." as requiring that Furrow inform purchasers that they must remove property. This is what Furrow did when it placed the language in the auction guide from the Bankruptcy Court order. Mr. Furrow testified that Furrow had auctioned immovable property before, but to his knowledge, it had never been involved in the moving of such property. Mr. Furrow admitted that as of the time it accepted the high bid at the auction, Furrow was best able to determine whether the buyer had permits, certificates of insurance and had the experience and training to safely dismantle the monorail station. But, he said, that was not the way Furrow and LWE agreed to do it.
Michael Carlson was hired by the LWE in June 1982 as Vice President of site development. He continued in that position until January 15, 1985. Carlson was responsible for all design and construction at the fair and later was responsible for devising the plan to auction LWE assets. Carlson received proposals from a number of auction companies, including Furrow. Carlson negotiated with Furrow to be the auctioneer and said that all negotiations were with Sam Furrow, the owner of Furrow. Although he did not draft the Auction Agreement, Carlson stated he had a lot of input into the drafting of the document. Carlson said LWE was obligated by a lease with the Dock Board to return the property on which Monorail Station # 3 was situated to the Dock Board in a condition equal to or better than the condition it was in at the inception of the lease.
Carlson confirmed that during negotiations with Furrow, including meetings with the LWE attorney who drafted the auction contract, in his meetings with the management committee of LWE, and in his meetings with Petr Spurney, the director of the LWE, he never expected that Furrow would provide supervision of the dismantling *510 of the monorail system. He also confirmed that he did not ever expect Furrow to be responsible for collecting the building permits and certificates of insurance for the dismantling of immovable structures such as the monorail stations.
Although the purchasers of the monorail station had 45 days to remove it, Carlson never anticipated or expected that Furrow would remain on the fair site for 45 days. Even though purchasers were supposed to completely dismantle and remove what they purchased, Carlson said LWE anticipated that some purchasers would take what they wanted and leave the rest, and that LWE would have to dispose of it. He would not have expected Furrow to remove anything that the purchasers left on the site. Carlson said it was never contemplated by himself or LWE that Furrow enforce or ensure the removal of any auctioned items such as the monorail station.
Insofar as safety for the dismantling/demolition of the monorail station, Carlson testified that the public would be protected because the site was contained and the public was not allowed free access, and he also stated that LWE left two field site people and operations people on the site. He said no money was available for LWE to pay for supervisory personnel. On questioning by counsel for plaintiff, Carlson agreed that Furrow was in the best position to make inquiries as to whether or not the purchasers had necessary permits, although he said that wasn't the way they did it and reiterated that he did not think that Furrow had the obligation to check the purchasers.
Asked about Paragraph 12 of the auction contract, Carlson testified that the "security" LWE was specifically required to furnish meant security to prevent theftto make sure that correct purchasers left with the property they purchased. He also said it was to prevent the public from going to the fair site and anyone who had no business there after the fair ended. Asked about the interpretation given Paragraph 11 by Mr. Furrow, that Furrow was to "inform" buyers that property must be removed, Carlson said he would agree with that interpretation, as opposed to Furrow itself requiring that the property be removed.
David Falgoust was a senior staff attorney for LWE from September 1982 to early December 1984. Falgoust prepared a draft of the Auction Agreement which he said, was substantially the same as the one finally signed on December 13, 1984 by the parties. He met with Michael Carlson and Mr. Furrow prior to preparing the draft proposal. Falgoust said that the phrase Furrow "shall require" meant that Furrow was to make it clear to purchasers that purchasers, themselves, would remove the property purchased. Falgoust said he was "sure" that it was never intended by the parties that Furrow enforce removal of the property or provide security for dismantling of the monorail station.
LWE president Peter Spurney stated in a deposition that after filing for bankruptcy, the Bankruptcy Court would not allow LWE to expend money for restoring the fair site to the condition it was in before the fair. They decided to auction property with the condition that purchasers had to handle any dismantling or demolition themselves. The bankruptcy court okayed the auction plan on the condition that purchasers remove their own property.
Spurney stated that LWE had a staff in site development which was coordinating with the purchasers of the items to secure the items and to "try and insure that the safety and security required were maintained." He said LWE employees Ken Futch and Len Panas were responsible for the coordination of the site restoration "which was being conducted through people who had purchased assets at the auction." He said Futch and Panas, who were involved in the construction of the fair site, were responsible for insuring that the demolitions were done in an orderly and safe manner.
Spurney's deposition was taken in October 1986, some nine months before plaintiffs filed their fourth supplemental and amending petition alleging negligence on the part of Furrow. As such, the deposition primarily focused on the role of LWE *511 rather than Furrow. However, Spurney stated that it was LWE's responsibility to oversee and insure that the purchasers fulfilled the conditions of sale set out in the rules and regulations of the auction.
Kenneth R. Futch was employed by the LWE as a Project Coordinator. Futch testified that after the auction it was his job to see that contractors demolished structures safely and got them off the fair site. Futch said that at LWE meetings after the auction he was informed that if he observed a contractor doing any unsafe dismantling he was supposed to say something to the contractor about it.
Robbie Franklin, Vice President in charge of Furrow's industrial division, testified that it was his understanding that LWE would have two people on the fair site after the auction to require permits and ensure the dismantling process was being safely handled. In addition, he said LWE controlled access to the fair site.
Plaintiff qualified Timothy Mutz as an expert auctioneer with a specialty in industrial auctioneering. Mutz's testimony was directed to establishing the standard of care of a reasonable auctioneer. He said it was reasonable in the industry for the auctioneer to check permits, certificates of insurance and the qualifications of those who would be dismantling structures. He also said it was customary in the industry to have a representative of the auction company at the site until the auctioned property is removed.
However, on cross-examination, Mutz admitted that it is usually and customarily an agreement between the seller and the auctioneer that define the responsibilities of the two parties. Mutz was asked whether it was usual and customary that if auctioneers are expected to be responsible for the supervision of the removal of merchandise from the premises, that this be included in the contract between the seller and the auctioneer. He replied: "It's very important. Yes."
Eugene Higbee, a Building Inspector for the City of New Orleans, testified that the City had issued building permits for construction of the fair, including Monorail Station No. 3, which was constructed on Dock Board property. Higbee said LWE required the builders to obtain the permits, even though the City could not have stopped construction for safety reasons because it was on Dock Board property. He inspected the construction work, including Monorail Station No. 3, for safety, but again, reiterated that he could not have stopped the construction. Likewise, he said that even if the City had issued a permit for the dismantling of the monorail station, he could not have stopped the dismantling work if it had been proceeding in an unsafe manner. Higbee also testified that even if he had issued a permit for the dismantling work and inspected the site, and had authority to do something, he would not have required barricades around the monorail site because his department considered the entire fair site a demolition site, access to which was restricted and controlled. Higbee testified that the Building Code of the City of New Orleans would not apply to such work. It is obvious that any building permits issued by the City relating to work on Dock Board property were virtually worthless insofar as the City being able to enforce safety requirements.
In its reasons for judgment the trial court cited Furrow's alleged duties under its contract with LWE as a basis for imposing a duty on Furrow to supervise the dismantling operation. The trial court cites a duty on the part of Furrow to remain on the fair site until the property was removed. Even assuming there was such a duty to remain on the site that long, which is denied by Furrow, it is irrelevant to liability absent a duty to supervise the dismantling of the monorail station, or evidence that it was more probable than not that such a presence would have prevented the harm occurring to plaintiff.
In its reasons for judgment the trial court cited the case of Levi v. S.W. La. Elec. Membership Co-op, 542 So.2d 1081 (La.1989). In Levi, the plaintiff was seriously injured when a piece of truck-mounted oil-field equipment he was operating came into contact with an uninsulated high-voltage power line. The Levi court determined *512 that the power company had a duty to exercise reasonable care to prevent persons from being injured because it knew or should have known that the power lines presented an unreasonable risk of harm to persons such as the plaintiff. In reaching its decision the Levi court cited extensive Louisiana jurisprudence holding, among other things, that power companies employing high-voltage power lines are required to exercise the "utmost care" to reduce hazards to life. It found a duty on the part of the power company after finding that the company was required to recognize the hazard, and that the hazard posed an unreasonable risk of harm.
In the instant case the dispositive issue of the Levi analysis is whether Furrow was required to recognize the hazard. The parole evidence, and other evidence concerning the roles and capacities of Furrow and LWE clearly indicate that it was not the intent of the parties to the Auction Agreement that Furrow be responsible for supervising the dismantling of the monorail station, that it enforce the condition imposed by the U.S. Bankruptcy Court that the property be removed to the slab, that it check the qualifications of whomever was to dismantle the purchased structures, whether the purchaser or person hired by the purchaser, or to check and verify permits and certificates of insurance. Furrow's core duties under the contract were simply to sell the LWE property and turn over the receipts, less its commission and certain expenses, to LWE. In performing those duties Furrow was required to perform other necessary duties to prepare for and conduct the auction, such as tagging inventory. Other than a duty contingent upon the purchaser not paying for property, or failing to claim and remove it, the only duties remaining after the auction were to pay LWE its monies and provide an accounting.
Furrow's duty contingent upon a buyer's failure to pay for purchases, or claim and remove them was to return such property to LWE upon LWE's demand. Absent such demand, Furrow had the authority "to reclaim" and resell the affected property. Even assuming that this clause in Paragraph 11 implicitly required a Furrow representative to be on the fair site to take such action, there was still no duty on Furrow's part to supervise the dismantling of the monorail station and insure it was being done safely.
The testimony of Timothy Mutz, plaintiff's expert auctioneer, may have established some duties of a reasonable auctioneer, but it also confirmed that the duties of the parties are determined by the Auction Agreement and the intent of the parties when they entered into that agreement. It was not the intent of the parties when they entered into the Auction Agreement that Furrow supervise the dismantling of the monorail station and ensure that it was being done safely, or check the qualifications of buyers or dismantlers, or the permits or certificates of insurance of such persons.
This is not a case where Furrow contracted with another party to perform duties it owed to plaintiff. Furrow did not attempt to contract away its responsibility to supervise dismantling of the monorail station. It had no such duty by contract or otherwise. If supervision of the dismantling process was needed, LWE was in a better position to do it than Furrow. LWE had complete custody and control of the fair site. It had the personnel and expertise to supervise the safe dismantling of the monorail station; it had supervised the safe construction of the structure. There was no reason for Furrow to believe that LWE would fail to perform these duties. Furrow owed no duty to plaintiff and others to second guess LWE and double check to determine whether LWE was performing those duties.
Even if one accepts that Furrow was in a good position to check qualifications and permits and certificates of insurance at the time of sale, it was not contemplated by the parties that Furrow assume this responsibility. LWE required permits for the construction of the monorail station, and it required them for the dismantling. Moreover, aside from the question of duty, there is no evidence establishing *513 that the persons who dismantled the monorail station were not qualified to do the job. A qualified person could have acted negligently as well as an unqualified person. Even assuming that Furrow owed and breached a duty to check permits, the testimony of Eugene Higbee of the City of New Orleans, Department of Permits, bars the finding of a causal connection between such breach and plaintiff's injuries. Higbee testified the City had no authority to stop demolition proceeding in an unsafe manner on Dock Board property, and that he would not have placed or recommended the placement of barricades around the site. There is no evidence establishing that it was more probable than not that had Furrow checked permits at the time of the sale, this accident would not have happened.
Considering these facts and circumstances, we find that the evidence furnished no basis for finding that Furrow owed a duty to supervise the safe dismantling of Monorail Station # 3, to check the qualifications of persons dismantling the structure, to check the permits of persons doing the dismantling, or to check the certificates of insurance of those persons. The trial court's finding to the contrary was clearly wrong.
Our decision on the liability of Furrow renders moot other assignments of error regarding damages awarded to the Lapers, the apportionment of fault between Furrow, LWE and Brown, and the trial court's denial of defendants' motion for involuntary dismissal.

THIRD-PARTY DEMAND
Paragraph 13(e) of the Auction Agreement between Furrow and LWE required that Furrow provide a certificate of insurance to LWE naming LWE and its employees as additional insureds under Furrow's $5,000,000.00 liability insurance policy. Paragraph 14 contained an indemnity clause obligating Furrow to indemnify LWE under certain circumstances. First State, LWE's excess insurer, filed third-party demands against Furrow and its insurers, Reliance and Cincinnati. The trial court dismissed First State's claims against all three third-party defendants, finding that the breach of Furrow's obligation under the Auction Agreement did not cause LWE or First State any damage. The trial court reasoned that LWE's fault in causing the harm to plaintiff was the basis of First State's liability, not the failure of Furrow to secure the coverage required under the auction agreement.
In its reply brief, First State sets out "essentially three theories of recovery" under which it claims it is entitled to recover. It lists these as:
1) General contractual indemnity for [Furrow's] negligence;
2) Breach of the contractual provision requiring [Furrow] to provide insurance for LWE; and
3) Indemnity for [Furrow's] legal fault in breaching the contractual provision to provide insurance.
We first examine contractual indemnity. Paragraph 14 of the Auction Agreement, the indemnity clause, provides:
Furrow shall protect, defend, indemnify and hold LWE harmless from and against any and all costs, claims, demands, actions, expenses, damages and liabilities arising out of or in connection with the obligations of Furrow under this Agreement or caused by the negligence or other legal fault of Furrow.
A contract of indemnity will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms. Home Ins. Co. v. National Tea Co., 588 So.2d 361 (La.1991); Perkins v. Rubicon, Inc., 563 So.2d 258 (La.1990); Polozola v. Garlock, 343 So.2d 1000 (La.1977). Paragraph 14 does not evidence an intention by the parties in unequivocal terms that the indemnity clause was intended to provide indemnification for LWE even if the need for indemnification was a direct result of its own fault, and not the result of any fault of Furrow. Therefore, we will not construe Paragraph 14 as providing for indemnification where LWE has been found to be at fault and Furrow has not.
*514 Moreover, Paragraph 14 limits indemnity to acts "arising out of or in connection with the obligations of Furrow" under the Auction Agreement. In the instant case, we have determined that Furrow owed no obligation under the Auction Agreement to insure the safe removal of the monorail station, to check the qualifications of whoever would be dismantling the structure, or to check permits or certificates of insurance of the dismantlers. Because Furrow had no such obligations under the Auction Agreement, and was not negligent or at fault, Paragraph 14 clearly imposes no duty to indemnify LWE or its insurer First State for LWE's liability which was a direct result of LWE's fault.
Paragraph 13(e) of the Auction Agreement required that Furrow provide a certificate of insurance to LWE naming LWE and its employees as "additional insureds" under Furrow's $5,000,000.00 liability insurance policy. The trial court found, and the evidence shows, that Furrow failed to furnish LWE with this certificate of insurance, or to name LWE and its employees as additional insureds under its policies with either Reliance or Cincinnati.
We now consider whether First State, as the excess insurer of LWE, may assert a cause of action against Furrow, Reliance and/or Cincinnati for Furrow's breach of its contractual obligation to name LWE as an additional insured on its liability policy or policies. The trial court did not address this issue in its reasons for judgment. We find the trial court did not address this issue because it was not before the trial court and is not before this court. First State's third-party claims set forth a cause of action only for indemnification, not for breach of contract.
Although some evidence introduced at trial may have incidentally related to a cause of action for breach of contract, we do not consider that the pleadings were thereby enlarged so as to set forth such a cause of action. If evidence was admissible for any purpose, it could not serve to enlarge the pleadings without the express consent of the opposing party. LeBleu v. Mitchell, 542 So.2d 841 (La.App. 3rd Cir. 1989).
First State also alleges that it is entitled to indemnification for Furrow's negligence in failing to name LWE as an additional insured on its liability policy or policies. We find this argument unsound. If First State is entitled to indemnification, it is entitled only insofar as LWE is. We believe, as the trial court did, that LWE is not entitled to be indemnified for liability which is a direct result of its own fault. See discussion supra. While LWE may have been accountable for damages because of Furrow's negligence in failing to name it as an additional insured, it was ultimately liable for those damages because of its own fault.
First State also submits that it was an insured under the policy issued by Cincinnati by virtue of a Part II(D) which provides:
Each of the following is an Insured under this policy to the extent set forth below:
* * * * * *
(d) Any person, organization, trustee or estate with respect to which you [Furrow] are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of, or to facilities of or used by you [Furrow]. (emphasis added)
We interpret this provision as providing coverage for a party such as LWE only if the occurrence for which coverage is claimed was an "operation by" Furrow, an operation "on behalf of" Furrow, was related "to facilities of" Furrow, or was related "to facilities used by" Furrow. The policy language is not ambiguous at all. The language of this Commercial Umbrella Liability Policy is intended to limit coverage for other persons strictly to claims directly related to (1) the business operations of or on behalf of the named insured, and (2) facilities owned by or used by the named insured. In the instant case we have already determined that the occurrence for *515 which First State seeks coverage occurred outside the scope of Furrow's auction operations and not on any facilities being used by Furrow at the time. Furrow personnel had left the site some two weeks before the occurrence of this accident. LWE was not an insured under the Cincinnati policy.
We find no merit to any of First State's arguments in support of its third-party claims against Furrow, Reliance or Cincinnati.
For the foregoing reasons, we reverse the trial court judgment insofar as it found defendant, Furrow Auction Company at fault in causing harm to Police Officer and Mrs. John Laper, and found Furrow Auction Company, Cincinnati Insurance Company or Reliance Insurance Company liable for damages to Police Officer and Mrs. John Laper. We affirm that part of the trial court judgment dismissing the third-party claims of First State.
REVERSED IN PART; AFFIRMED IN PART.
Rehearing Denied May 12, 1993.
BARRY, Judge, would grant a rehearing.
First State's Third Party Demand (as amended) pleaded an alleged breach of contract between Furrow and LWE. That fact is evidenced by the lower court's written reasons which state:
The contract between FAC and LWE required that LWE be named as an additional insured with $5 million coverage. The evidence supports a conclusion that FAC failed to obtain that coverage in favor of LWE.
Obviously, the breach of contract issue was considered by the trial court and was properly before this Court. Our opinion to the contrary was erroneous.
Further review of the record convinces me that this Court may have tampered with the fact finding-much discretion vested at the trial level. Considering the voluminous and conflicting parol testimony, I now question whether we even had the opportunity to apply our manifest error standard. Rosell v. ESCO, 549 So.2d 840 (La.1989).
I would grant a rehearing.[1]
NOTES
[1] The language in plaintiffs/appellees' brief, such as this Court giving "lip service", is unwarranted in legal argument and should have caused the brief to be returned.